**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRIENDS OF ANIMALS | ) | |
| 777 Post Road, Suite 205 | ) | Civ. No. _____ |
| Darien, CT 06820 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Honorable HOWARD LUTNICK | ) | |
| in his official capacity as | ) | |
| Secretary of Commerce, | ) | |
| United States Department of Commerce | ) | |
| 1401 Constitution Ave NW | ) | |
| Washington, DC 20230, and | ) | |
| | ) | |
| NATIONAL MARINE FISHERIES SERVICE, | ) | |
| an agency within the United States | ) | |
| Department of Commerce, | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**INTRODUCTION**

1.      The best scientific evidence available shows that whales, dolphins, and porpoises—members of the order Cetacea—do not belong in captivity. Cetaceans are highly intelligent, social animals with sophisticated cognitive abilities. Subjecting any cetacean to the unnatural conditions of captivity is inhumane and unethical. The import, export, and public display of cetaceans irreparably disrupts both the affected individuals and the social structures of their original groups. Captive breeding ensures that future

1

generations of cetaceans will continue to suffer in these unnatural and profit-driven habitats.

2.      Current regulations promulgated by the National Marine Fisheries Service (NMFS) under the Marine Mammal Protection Act (MMPA) allow for the import of cetaceans for public display in a variety of circumstances, despite the overwhelming scientific evidence of the physical and psychological harm caused by import and captivity.

3.      Even where the MMPA prohibits importation for public display, such as for pregnant and nursing cetaceans and those taken from depleted stocks, the current regulations still allow facilities to display and breed these animals by characterizing such activities as "incidental" to research.

4.      In 2022, Friends of Animals submitted a petition for NMFS to issue new regulations that would restrict the import, export, breeding, and public display of cetaceans in the United States (hereinafter, "the Petition").

5.      Through the Petition, Friends of Animals sought to ensure that any future import and export of cetaceans would be authorized only when it was in the best interests of the cetaceans. Additionally, Friends of Animals sought to prohibit the breeding of captive cetaceans a practice which aquariums rely on to maintain profitable populations and to attract customers.

6.      On August 16, 2024, NMFS issued a response to the Petition (hereinafter, "the Response") in which it summarily denied all requested regulatory amendments. In the Response, NMFS failed to articulate a rational explanation for its decision to deny Friends of Animals' Petition and to maintain regulations that continue to jeopardize the lives and

wellbeing of whales, dolphins, and porpoises by allowing unjustifiable importation, exportation, public display, and breeding.

7.      NMFS failed to respond to any of the scientific evidence presented in the Petition. Instead, NMFS simply asserted that the MMPA prohibited it from issuing the requested regulations. NMFS's response was based on a fundamental misunderstanding of the MMPA. As such, NMFS failed to provide a reasonable explanation to Friends of Animals and the public regarding its denial.

8.      Plaintiff, Friends of Animals, brings this action against Defendants, Howard Lutnick and NMFS, for their for arbitrary denial of Friends of Animals' Petition under the Administrative Procedure Act (APA). Friends of Animals seeks a transparent and adequate review of the Petition that provides Friends of Animals, its members and staff, and the general public with a reasoned explanation for the agency's decision to grant or deny it. Defendants must justify its denial of the Petition and its continued approval of practices that are dangerous, harmful, and scientifically outdated.

9.      Defendants' failure to articulate a rational connection between the facts found and the choice made to deny the requested amendments is arbitrary and capricious within the meaning of the APA. 5 U.S.C. §§ 701-06.

10.     Defendants' failure to consider the best scientific evidence available in prescribing regulations permitting the import, export, public display, and breeding of marine mammals violates the MMPA and is arbitrary and capricious under the APA. 16 U.S.C. § 1373; 5 U.S.C. §§ 701-06. To remedy Defendants' violation of the law, Friends of Animals seeks declaratory and injunctive relief vacating the Response and requiring Defendants to comply with the MMPA and APA.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331
(federal question) and 5 U.S.C. §§ 701-706 (authorizing federal courts to review agency
actions). This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States
is a defendant.

12.     This Court has authority to grant Plaintiff's requested relief pursuant to 28
U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706
(Administrative Procedure Act).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), as Defendant
the Secretary of Commerce, in his official capacity, resides in this district.

**PARTIES**

14.     Plaintiff FRIENDS OF ANIMALS is a non-profit international advocacy
organization incorporated in the state of New York since 1957. Friends of Animals seeks to
free animals from cruelty and exploitation around the world, and to promote a respectful
view of non-human, free-living, and domestic animals. Friends of Animals engages in a
variety of advocacy programs in support of these goals. Friends of Animals informs its
members about animal advocacy issues as well as the organization's progress in addressing
these issues through its magazine, *Action Line*, its website, and other reports. Friends of
Animals has published articles and information advocating for the protection of wildlife
species so that they can live unfettered in their natural habitats. For more than two
decades, its members and staff have actively participated in conservation efforts, including
those protecting captive and wild animals under the MMPA.

15.     In 2020, Friends of Animals opposed a permit issued by the Defendant NMFS to Mystic Aquarium ("Mystic") authorizing the import of five beluga whales from Marineland in Canada. Despite Friends of Animals' objection and legal challenge, Mystic imported the belugas to their facility. Tragically, the fears of Friends of Animals and others proved to have been prescient. Within nine months of their transfer to Mystic Aquarium, two of the young beluga whales died and another became critically ill. Two years later, another young, imported beluga also died at Mystic.

16.     Defendants' arbitrary and capricious denial of the Petition violates the MMPA and APA and injures Friends of Animals' ability to pursue its missions of advocating for animals and of educating its members and the public about government actions that impact animals. Friends of Animals has an interest in receiving a reasonable response to its Petition. As the result of Defendants' denial, Friends of Animals has expended resources to gain information regarding Defendants' current policy surrounding the import, export, public display, and breeding of cetaceans. In addition, the denial impacts Friends of Animals' daily activities as it must spend time and resources to advocate for animals in captivity, including monitoring captive animals, and opposing unwarranted imports and transports.

17.     Defendants' arbitrary and capricious denial of the Petition violates the MMPA and APA, injuring Friends of Animals' members and staff. Friends of Animals' members and staff visit facilities holding cetaceans in captivity to protest and check on the well-being of captive cetaceans. Friends of Animals' members and staff have an interest in the humane treatment of cetaceans and observing them in humane conditions. Friends of Animals members and staff enjoy visiting coastal areas to observe and study these animals in the

wild, where they are able to live full lives in their natural habitat. The traumatic capture,

transport, and confinement of cetaceans inflicts direct aesthetic and emotional harm on

Friends of Animals' staff and members. These individuals experience distress, frustration,

and diminished enjoyment when encountering or learning about cetaceans held in

captivity.

18.    Defendant HOWARD LUTNICK is the U.S. Secretary of Commerce and is sued

in his official capacity. Mr. Lutnick is responsible for the actions of NMFS.

19.    Defendant NATIONAL MARINE FISHERIES SERVICE (NMFS), also known as

NOAA FISHERIES, is an agency within the National Oceanic and Atmospheric

Administration (NOAA) and the United States Department of Commerce. NMFS is the

federal agency responsible for the federal regulation and conservation of the nation's

marine resources, including promulgating and administering regulations under the MMPA.

NMFS is responsible for complying with all federal laws.

**LEGAL FRAMEWORK**

**A. The Marine Mammal Protection Act**

20.    Congress passed the Marine Mammal Protection Act (MMPA) to protect

marine mammals and to "maintain the health and stability of the marine ecosystem." *See* 16

U.S.C. § 1361(6).

21.    The MMPA created a strict moratorium on the take and importation of all

marine mammals and marine mammal products. 16 U.S.C. § 1371(a).

22.    The term "marine mammal" includes all members of the order Cetacea, or

"cetaceans." 16 U.S.C. § 1362(6)(A).

23.     The MMPA only includes a few narrow exceptions to the moratorium, stating that the Secretary "may" issue permits  "for purposes of scientific research, public display, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock." 16 U.S.C. § 1371(a)(1); *see also*, 50 C.F.R. § 216.11 *et seq*.

24.     The MMPA creates additional restrictions for importation of marine mammals who are pregnant, nursing, or from depleted species or stocks.  16 U.S.C. § 1372(b).

25.     The MMPA does not authorize the Secretary to permit the taking of these marine mammals for public display purposes. Instead, the importation of these marine mammals may only occur for scientific research or enhancing the survival or recovery of a species or stocks. 16 U.S.C. § 1372(b).

26.     Moreover, the MMPA prohibits the importation of these animals if "taken in a manner deemed inhumane by the Secretary." 16 U.S.C. § 1372(b)(4).

**B.  The scope of NMFS's regulatory authority under the MMPA.**

27.     Under the MMPA, the Secretary is tasked with prescribing regulations consistent with the Act's purposes and policies. 16 U.S.C § 1373(a).

28.     The term "Secretary" means "the Secretary of the department in which the National Oceanic and Atmospheric Administration [(NOAA)] is operating, as to all responsibility, authority, funding, and duties under this Act with respect to members of the order Cetacea and members, other than walruses, of the order Pinnipedia." 16 U.S.C. § 1362(12)(A)(i); 50 C.F.R. § 216.3.

29.     The Secretary delegates this regulatory authority to NMFS, an agency under NOAA. The Office Director has regulatory authority to prescribe procedural rules regarding

the submission and review of special exception permits. 50 C.F.R. § 216.33. The regulations

define the Office Director as NMFS. 50 C.F.R. § 216.3.

30.    The MMPA requires NMFS, "on the basis of the best scientific evidence

available," to prescribe regulations "with respect to the taking and importing of animals

from each species of marine mammal." 16 U.S.C. § 1373(a).

31.    NMFS has wide discretion to prescribe regulations regarding the taking and

importing of marine mammals "as [it] deems necessary and appropriate to insure that such

taking will not be to the disadvantage of those species." 16 U.S.C. § 1373(a).

32.    When prescribing regulations under the MMPA, NMFS is obligated to "give

full consideration to *all factors* which may affect the extent to which [marine mammals]

may be taken or imported." 16 U.S.C. § 1373(b) (emphasis added). These factors include

but are not limited to: existing and future population levels; existing treaties;

environmental considerations related to the marine ecosystem; the conservation of fishery

resources; and the economic and technological feasibility of implementation. 16 U.S.C. §§

1373(b)(1)-(5).

33.    NMFS has the authority to prescribe restrictions on the take and import of

marine mammals, which "may include, but are not limited to, restrictions with respect to"

the age, sex, size, and number of animals which may be taken pursuant to a permit; the

season, manner, and location in which an animal may be taken; and, the methods by which

an animal may be taken. 16 U.S.C. §§ 1373(c)(1)-(5).

34.    NMFS regulations prescribed pursuant to Section 1373 of the MMPA "may be

modified from time to time in such a manner that the Secretary deems consistent with and

necessary to" further the purposes of the MMPA. 16 U.S.C. § 1373(e).

35.    NMFS defines terminology set out by, and relevant to, the MMPA including specific species, geographic locations, and classes of persons, among other terms. 50 C.F.R. § 216.3.

36.    The list of terms defined in 50 C.F.R. § 216.3 has been added to, modified, or otherwise amended numerous times since the regulation was initially prescribed.

37.    NMFS is tasked with overseeing the issuance of permits pursuant to special exceptions to the general take moratorium for purposes of "scientific research, public display, photography for educational or commercial purposes, or enhancing the survival or recovery of a species or stock." 16 U.S.C. § 1371(a)(1); *see also*, 50 C.F.R. § 216.11 *et seq*.

38.    NMFS has regulatory authority to prescribe procedural rules regarding the submission and review of special exception permits. 50 C.F.R. § 216.33.

39.    NMFS regulates the criteria upon which a special exception permit may be issued. 50 C.F.R. § 216.34(a).

40.    NMFS sets additional criteria for the issuance of special exception permits granted for the purposes of scientific research and enhancement, photography, and public display. 50 C.F.R. §§ 216.41-43.

41.    NMFS allows for the public display of cetaceans under a permit issued for scientific research or species enhancement, so long as the display is incidental. 50 C.F.R. § 216.41(b)(6)(v).

42.    NMFS requires that the permitted importation or taking of any marine mammal be done in a "humane" manner. 50 C.F.R. § 216.35(c).

43.     With respect to the MMPA, humane is defined as "the method of taking, import, export, or other activity which involves the least possible degree of pain and suffering practicable to the animal involved." 50 C.F.R. § 216.3; 16 U.S.C. § 1362.

44.     NMFS prohibits any permit holder from taking or importing "any marine mammal which at the time of taking is either unweaned or less than eight months old, or is a part of a mother-calf/pup pair," unless specifically authorized. 50 C.F.R. § 216.35(d).

45.     NMFS prescribes prohibitions and exceptions to human activities that affect specific species and populations of cetaceans—humpback whales and spinner dolphins—including their import. 50 C.F.R. §§ 216.18-20. These species are not explicitly named or indirectly referenced by the MMPA.

46.     NMFS prohibits any permit holder from releasing a captive marine mammal into the wild unless specifically authorized under a scientific research or enhancement permit. 50 C.F.R. § 216.35(e).

**C.  The Administrative Procedure Act**

47.     Section 553(e) of the Administrative Procedure Act (APA) provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

48.     A final agency action is subject to judicial review. 5 U.S.C. § 704.

49.     The denial of a rulemaking petition in the context of the MMPA is a final agency action.

50.     The reviewing court shall hold unlawful and set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2).

51.     Upon finalizing an agency decision, NMFS is obligated to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

52.     A satisfactory explanation requires a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 158 (1962)).

53.     A court will normally deem an agency action to be arbitrary and capricious if the agency relies on factors outside of those which Congress intended it to consider, entirely fails to consider important aspects of the issue, articulates an explanation for its action that runs counter to the evidence presented, or makes a decision that cannot be ascribed to a difference in viewpoint or agency expertise. *State Farm*, 463 U.S. at 43.

54.     "The role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Thus, it is the role of the Court, not an agency, to determine a statute's "single, best meaning." *Id.* at 400.

## FACTUAL BACKGROUND

**A. The harmful effects of importation, breeding, public display, and captivity on cetaceans**

55.     The order Cetacea is comprised of all species of whale, dolphin, and porpoise.

56.     There are over 500 cetaceans held in captivity across approximately 33 aquariums, zoos, and marine mammal parks in the United States.

57.     The import, export, or take of cetaceans causes severe harm and emotional and physical suffering to those individual animals who are taken.

58.     The import, export, or take of cetaceans causes severe emotional suffering and impacts the well-being of groups of cetaceans from which individuals are removed.

59.     Cetaceans are highly intelligent and social animals.

60.     In the wild, beluga whales live in pods that can reach up to twenty-five members; dolphins live in pods that reach up to thirty members; and porpoises live in pods that reach up to ten members.

61.     Cetaceans are generally playful and affectionate towards members of their pods and communicate with individual pod members through complex patterns of language.

62.     Cetaceans are naturally migratory and wide roaming; on a regular basis they travel between thirty-five and one-hundred and forty miles per day, reach speeds up to thirty miles an hour, and dive up to thousands of feet in depth.

63.     The import and export of cetaceans from the wild to a captive facility, or from one facility to another inherently involves removing the animal or animals from the home (and usually the family) they are familiar with, transporting them long hours via truck, plane, and/or boat, and placing them in an unfamiliar environment and often with unfamiliar animals. Once in the U.S., the cetaceans can be, and often are, transported multiple times to different facilities across the country without an MMPA permit.

64.     The import and export of cetaceans can impose extreme negative impacts on their general safety, health, and welfare. Capture, restraint, and transport can be particularly stressful for cetaceans given the unnatural physical compression they experience during transport as a result of confined space. The traumatic experience

cetaceans face during capture and every transport leads to heightened stress that not only affects their physical and mental health in captivity but can also cause mortality.

65.     Import or transport between facilities is also traumatic. For example, the process to import five beluga whales from Marineland of Canada to Mystic Aquarium in the United States involved the following: removing the belugas from the only home and family they had ever known; removing the belugas from their tanks at Marineland and lifting them into the air by a crane; transporting them on a truck for at least an hour to the airport; forcing them to linger in their crates at the airport for two hours; flying them in a loud cargo plane for two hours to Hartford, Connecticut; unloading them from the plane; driving them on a truck for more than an hour to Mystic; and finally removing them from their crates and lifting them into the air by a crane and depositing them into a holding pool at Mystic.

66.     A cetacean subjected to the trauma associated with relocation can suffer negative short to long-term mental and physical effects, including an increased risk of death.

67.     Studies have found that marine mammals suffer significant physiological impacts from capture and handling, particularly cetaceans.

68.     The risk of mortality in dolphins increases significantly immediately following capture from the wild or transport from one facility to another.

69.     The trauma and the physical and psychological harm experienced by marine mammals does not end when transport concludes. Instead, these animals continue to endure chronic stress throughout their lives in captivity. This ongoing distress stems from the artificial and unnatural environments in which they are confined, the exploitation of

13

their emotional and cognitive capacities for entertainment and profit, and their repeated exposure to physical harm through constant human interaction. Collectively, these stressors contribute to serious health problems and reduced life expectancy.

70.    Once captive, cetaceans are kept in glass and/or concrete enclosures that do not come close to approximating their natural environments and disrupt their ability to form social structures, communicate, hunt, forage, swim, or to engage in other naturally enriching activities.

71.    Because the enclosures are spatially, acoustically, and visually unnatural, they routinely cause cetaceans to experience severe psychological distress, social conflict, physical harm, illness, and early death.

72.    These enclosures lack sufficient depth, natural features, hiding spaces, and environmental variability that would allow cetaceans to seek refuge from conspecifics or the public, resulting in a setting of constant, inescapable stress.

73.    Captive cetaceans are often subjected to poor quality feed, water containing high levels of bacteria, and deteriorating tank conditions (e.g., chipping paint).

74.    Facilities that hold cetaceans captive use permits issued by NMFS for scientific research or species enhancement as a loophole to profit from the import, breeding, and public display of cetaceans.

75.    Cetaceans placed on public display are constantly subjected to unnatural stimulation and stress caused by the presence of human spectators.

76.    Cetaceans held in captivity typically have shorter life expectancies than their counterparts in the wild.

77.     Cetaceans held in captivity display behaviors that are significantly altered compared with those observed in wild populations.

78.     The import, export, take, and captivity of cetaceans does not aid conservation efforts of marine mammal species in the wild.

79.     Scientific research on captive cetaceans does not contribute to accurate studies of natural patterns and behaviors of cetaceans in the wild.

80.     Modern tracking and data collection methods of cetaceans in the wild produce more scientifically sound studies than those performed on captive cetaceans.

81.     Holding cetaceans in captivity does not enhance the survival and recovery of any population or species of cetaceans.

82.     Scientific evidence shows that cetaceans bred in captivity cannot be safely released into the wild due to potential genetic maladaptation caused by captive breeding.

83.     Captive-bred cetaceans generally cannot be integrated into the wild because they will not learn or maintain skills essential to survival in the wild.

84.     No captive-born cetacean has ever been intentionally released into the wild in the United States.

85.     Captive breeding of cetaceans does not support the conservation of cetaceans.

86.     Captive breeding creates significant health risks for captive cetaceans and poses unique risk factors to cetacean infant mortality.

87.     Breeding cetaceans in captivity is cruel and unethical because it subjects offspring to a life of captivity.

88.     Captivity, public display, and breeding of cetaceans can harm wild populations by creating the false impression that these species are not threatened or endangered. Such practices influence markets, stimulate demand, and encourage the capture of wild animals for public display in other countries.

89.     The exhibition of cetaceans in the United States, in particular, sets a harmful precedent by motivating countries with weak or nonexistent regulations to establish entertainment parks and import wild-caught cetaceans to populate them.

90.     Conservation education in captive facilities can harm wild populations because it normalizes the confinement of marine mammals. Rather than fostering empathy for these animals and awareness of the importance of protecting their natural habitats, captivity desensitizes the public to the suffering caused by removing them from the wild and keeping them in artificial environments.

91.     The claims that mere exposure to live captive animals fosters greater environmental awareness or motivates public conservation action is not supported by empirical evidence.

92.     Multiple studies show that visits to zoos result in minimal, if any, measurable changes in visitor behavior related to conservation. While people may experience an emotional response when viewing or watching performances by live animals, this connection is illusory. It is not with the animal itself, but with a carefully constructed image created by the captive facility, often presented through anthropomorphic displays, such as dolphins painting pictures. Rather than fostering genuine empathy or conservation commitment, these experiences create a false sense of connection and further desensitize the public to the suffering and deprivation that marine mammals endure in captivity.

16

93.     Growing public sentiment against the captivity of cetaceans has led many national and local governments to ban the trade or display of cetaceans for entertainment purposes.

94.      Worldwide, governments have imposed strict regulations in support of the well-being of captive cetaceans.

95.     Countries that ban or restrict the trade of live cetaceans include: Argentina, Brazil, Chile, Costa Rica, Dominican Republic, Hungary, India, Malaysia, Mexico, Solomon Islands, and Switzerland.

96.     Countries that ban the display of cetaceans for entertainment include: Bolivia, Canada, Chile, Costa Rica, Croatia, Cyprus, Hungary, India, Kazakhstan, Nicaragua, Slovenia, and Switzerland.

97.     Countries with strict regulations that effectively banning display include: Brazil, Luxembourg, Norway, and the United Kingdom.

**B.  Recent efforts to import cetaceans**

98.     Six different aquariums in the United States that display captive belugas are part of the North American beluga breeding cooperative, which is a cooperative between zoos and aquariums to increase the number of beluga whales born in captivity and increase the population base of captive belugas (the "Breeding Cooperative"). These aquariums include Georgia Aquarium; Shedd Aquarium in Chicago; SeaWorld aquariums in San Diego, Orlando, and San Antonio; and Mystic Aquarium in Connecticut. The Breeding Cooperative commonly transfers belugas among facilities to ensure breeding.

99.     In 2012, each of the thirty-one captive belugas held in the U.S. were housed at an aquarium that is part of the Breeding Cooperative.

100.    In 2012, Georgia Aquarium submitted an application to NMFS to import eighteen beluga whales captured from the wild in Russia. The primary purpose of the permit application was "to enhance the North American beluga breeding cooperative by increasing the population base . . . ." *Ga. Aquarium v. Pritzker*, 135 F. Supp 3d 1280, 1286 (N.D. Ga. 2015).

101.    NMFS denied the application in 2013 because Georgia Aquarium failed to meet its burden under the MMPA.

102.    Georgia Aquarium filed a lawsuit challenging NMFS's denial of its permit application. The court granted the government's motion for summary judgment in 2015, and the belugas were never imported. But American aquariums' quest to acquire more belugas did not end.

103.    In 2019, Georgia Aquarium and Mystic Aquarium submitted an application for a permit to import five beluga whales from Marineland in Canada for what Mystic claimed was scientific research purposes.

104.    In 2020, NMFS granted a scientific research permit to Mystic Aquarium to import five young beluga whales from Canada.

105.    NMFS included a provision in Mystic's 2020 import permit prohibiting the breeding of the beluga whales and requiring Mystic to take active measures to prevent any breeding.

106.    Friends of Animals, together with another organization, filed a preliminary injunction in federal court challenging this highly controversial action. Among other arguments, the organizations contended that the permit violated the MMPA, the National Environmental Policy Act (NEPA), and the APA. They emphasized that the transport would

not only separate the whales from the only family they had ever known but would also subject them to extreme stress and serious short- and long-term health risks, including potentially fatal consequences.

107.    A judge denied the organizations' preliminary injunction seeking to stop the import.

108.    On May 14, 2021, Mystic began to transport the five young belugas, ranging in age from five to six years old, to its facility from Marineland.

109.    Despite the prohibition on breeding, Mystic had stated that it planned to seek government approval to breed the belugas after the five-year permit period expired.

110.    Following their import to Mystic, three of the five young belugas died. Havok died at just five years old, less than three months after import; Havana died at six years old, less than nine months after import; and Kharabali died in 2023 at nine years old.

111.    Beluga whales have a maximum life expectancy of 40 to 80 years in the wild.

112.    An inspection by the U.S. Department of Agriculture (USDA) in response to the death of Havok found three "critical violations" of the Animal Welfare Act (AWA): inadequate veterinary care; improper animal handling; and improperly maintained housing facilities.

113.    The USDA found that Mystic Aquarium did not alert a veterinarian to numerous behavioral abnormalities before Havok's death and concluded that Mystic "failed to provide adequate veterinary care by not using appropriate methods to prevent, control, diagnose and treat diseases during Havok'[s] last eight hours."

114.    The USDA found two other AWA violations: insufficient shelter to protect the belugas from the sun, which led to instances of Mystic whales contracting solar dermatitis; and high levels of irritating oxidants in beluga pools.

115.    Another USDA inspection regarding the death of Kharabali found two "critical violations" of the AWA: inadequate veterinary care and improper animal handling.

116.    Since the death of Havok in August 2021, NMFS has halted all research on the belugas imported from Marineland.

117.    Although NMFS granted Mystic's import permit solely for scientific research purposes, since August 2021, NMFS has suspended all scientific research on the two remaining belugas imported from Canada and, as of the filing of this Complaint, has not permitted research to resume.

118.    Mystic continues to display the remaining belugas to the public with the purchase of an admission ticket.

**C.  The Petition**

119.    Friends of Animals submitted the Petition to the Secretary of Commerce and NMFS on December 21, 2022, with the aim of preventing further harm and suffering caused to cetaceans by import, export, public display, and captive breeding.

120.    Through the Petition, Friends of Animals sought the initiation of the rulemaking process to amend 50 C.F.R. § 216.3 to define "best interest" to mean "relying on the best available scientific evidence to determine what is best for the individual marine mammal at issue"; "cetacean" to mean "any member of the Cetacea order, including a whale, dolphin, or porpoise"; and "sanctuary" to mean "a place of refuge where marine mammals: [l]ive in a captive setting as close as possible to their natural environment; [a]re

prioritized individually with respect to well-being and autonomy; and [a]re not used for profit or breeding."

121.    The Petition sought to amend 50 C.F.R. § 216.33 so that existing "exceptions for importation, exportation, public display, and breeding provided for in subparts C and D of [50 C.F.R. § 216] do not apply to cetaceans." In its place, the Petition proposed modified regulations to provide exceptions to the general restrictions on trade, to allow the import or export: (1) "[t]o a marine mammal sanctuary or facility, if the Marine Mammal Commission [(MMC)] makes an affirmative determination that the transportation to such a sanctuary or facility is in the best of the individual cetacean," or (2) "for release to the wild." Moreover, under the proposed regulations in the Petition, the MMC would be required to rely on the best available scientific evidence in determining whether an importation or exportation is in the best interest of the individual cetacean. Finally, the proposed regulations would make it "unlawful for any person or facility to breed, allow animals to breed, or artificially inseminate any cetacean."

**D. The Response**

122.    On August 16, 2024, NMFS issued a "full and final" Response denying all requested regulatory amendments.

123.    NMFS asserted that such amendments would "require a statutory change specific to cetaceans."

124.    NMFS maintained that "[t]he MMPA allows facilities to hold marine mammals, including cetaceans, in the United States for public display if three statutory criteria are met."

125.    NMFS stated that "[t]he MMPA further allows marine mammals and their progeny to be possessed, sold, purchased, transported, or exported for the statutory purposes of public display, without obtaining any additional permit or authorization from NMFS, provided statutory criteria are met."

126.    NMFS stated that it does not interpret the MMPA as giving NMFS "the authority to categorically prohibit activities that Congress has explicitly permitted through the statute, or allows the Secretary to permit on a case-by-case basis."

127.    NMFS's explanation for its denial is based on a misinterpretation of the MMPA.

128.    NMFS has wide discretion to prescribe regulations regarding the taking and importing of marine mammals.

129.    The requested regulatory amendments would not require a statutory change.

130.    NMFS failed to identify any provision of the MMPA that require NMFS to issue a permit if three statutory requirements are met.

131.    NMFS did not articulate a reasonable explanation for its decision not to amend 50 C.F.R. § 216.3 to define the terms "cetacean," "best interest," and "sanctuary."

132.    NMFS did not articulate a reasonable explanation for its decision not to amend regulations to prohibit captive breeding or artificial insemination of cetaceans.

**E. Friends of Animals' expansion of resources based on the Response.**

133.    As the result of the Response, Friends of Animals has devoted resources to continued advocacy for the well-being of cetaceans, as well as those aimed at gaining information regarding Defendants' current policy surrounding the import, export, public display, and breeding of cetaceans.

134.    On January 31, 2025, Friends of Animals submitted a public comment to oppose the proposed transfer and continued public display of Tyonek, a captive beluga currently held at SeaWorld San Antonio.

135.    On March 20, 2025, Friends of Animals submitted a public comment to oppose the import of five bottlenose dolphins from the Attica Zoological Park in Greece to Clearwater Aquarium in Clearwater, Florida for public display purposes.

136.    Friends of Animals is currently engaged in litigation to challenge the redactions and withholdings by Animal Plant Health Inspection Services (APHIS) and NMFS of documents relating to the deaths of beluga whales at Mystic Aquarium in Mystic, Connecticut.

## CLAIMS

### CAUSE OF ACTION

### (Arbitrary Agency Decision in Violation of the APA)

137.    Friends of Animals herein incorporates all information and allegations contained in the preceding paragraphs.

138.    NMFS acted arbitrarily and capriciously by denying the Petition on the grounds that it does not have statutory authority to order restrictions on the issuance of permits for the import and export of cetaceans with limited exceptions.

139.    NMFS acted arbitrarily and capriciously and not in accordance with the law by concluding that it does not have statutory authority to restrict the breeding of captive cetaceans.

140.    NMFS acted arbitrarily and capriciously and not in accordance with the law by basing its denial on a misinterpretation of the MMPA.

141.    NMFS acted arbitrarily and capriciously and not in accordance with the law by failing to adequately explain its decision regarding the Petition's proposed amendments.

142.    NMFS acted arbitrarily and capriciously and not in accordance with the law by failing to provide any explanation of its decision regarding the Petition's proposed amendments to 50 C.F.R. § 216.3.

143.    NMFS acted arbitrarily and capriciously and not in accordance with the law by entirely failing to consider the best scientific evidence available included in the Petition, as required by the MMPA.

**REQUEST FOR RELIEF**

Friends of Animals respectfully requests that the Court enter judgment providing for the following relief:

1. Declare that Defendants acted arbitrarily and capriciously in violation of the APA by failing to offer an explanation as to why they did not initiate the rulemaking process to define "best interest," "cetacean," and "sanctuary";

2. Declare that Defendants acted arbitrarily and capriciously by denying the Petition on the grounds that the MMPA does not grant statutory authority to NMFS to order restrictions on the issuance of permits for the take, import, public display, and breeding of cetaceans with limited exceptions;

3. Vacate and remand the Response and order Defendants to comply with the APA and MMPA;

4. Award Plaintiff reasonable costs, litigation expenses, and attorneys' fees associated with this this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5. Grant Plaintiff such other relief as the Court deems just and proper.

Dated: November 7, 2025        Respectfully submitted,

*s/ Andreia Marcuccio*
Andreia Marcuccio (DC Bar # CO0098)
Jennifer Best (DC Bar #CO00056)

Friends of Animals
Wildlife Law Program
6041 S. Syracuse Way, Suite 250
Greenwood Village, CO 80111
Tel: (720) 945-9453
andreia@friendsofanimals.org
jennifer@friendsofanimals.org

*Attorneys for Plaintiff*